# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER SINK<br>2646 Delsea Drive<br>Franklinville, NJ 08322<br>                    *Plaintiff*<br><br>vs.<br>SOUTHEASTERN PENNSYLVANIA<br>TRANSPORTATION AUTHORITY<br>1234 Market Street<br>Philadelphia, PA 19107<br>                    *Defendant* | :<br>:<br>:<br>: CIVIL ACTION NO. _____<br>:<br>:<br>: JURY TRIAL DEMANDED<br>:<br>:<br>:<br>: |

## CIVIL ACTION COMPLAINT

### Federal Employers Liability Act

Plaintiff, Christoper Sink, by and through his attorney, Trevor C. Serine, Esquire, files the following Complaint and in support thereof avers as follows:

1. Plaintiff brings this lawsuit under the Federal Employers Liability Act, 45 U.S.C.A. §§ 51 through 60, as amended ("FELA" or "Act").

2. FELA was enacted by U.S. Congress in 1908 as the sole remedy for railroad workers injured during the course of their employment, as workers covered under the Act are not eligible for state workers' compensation.

3. Plaintiff, Christopher Sink, is an adult individual residing at 2646 Delsea Drive, Franklinville, NJ 08322.

4. Defendant, Southeastern Pennsylvania Transportation Authority ("SEPTA") is a corporation organized and existing under the laws of the Commonwealth of

Pennsylvania with a registered place of business at 1234 Market Street, Philadelphia, PA 19107 Defendant provides, *inter alia*, regional rail service to the Greater Philadelphia area, as well as Delaware and New Jersey.

5. Venue and jurisdiction are proper in this Court, as Defendant owns, maintains, and operates a railroad and related facilities within the jurisdiction of this Court, and the injuries occurred within the jurisdiction of this Court.

6. Defendant is now and, at all times relevant to this case, has been, a "common carrier by railroad" engaged in interstate commerce within the meaning of 45 U.S.C.A. § 51.

7. Plaintiff is a railroad worker employed with Defendant for over seven (7) years as a Welder Specialist – Building and Bridges, and has been a professional Welder for over twenty (20) years.

8. Plaintiff was injured in an incident on or about November 9, 2023 while deployed by SEPTA on site owned and operated by Defendant.

9. Defendant SEPTA is responsible for providing a safe workspace, which it failed to do on the date of the incident, causing the Plaintiff's injuries.

10. Under FELA, railroads such as Defendant may not delegate the duty to provide employees with a reasonably safe workplace.

11. Defendant SEPTA is legally responsible for the injuries and damages as a result of the failure to provide a safe work environment and adhere to safety rules and regulations.

## INCIDENT

12. All preceding paragraphs are incorporated herein.

13. On or about November 9, 2023, while working within the scope of his duties as Welder Specialist – Building and Bridges for Defendant, Plaintiff was injured at a storage facility in Midvale Reporting Location, 4301 Wissahickon Avenue, Philadelphia, PA, due to the Defendant's negligence.

14. At the time of his injury, Plaintiff was working as part of Defendant's business as a railroad engaged in interstate commerce.

15. Plaintiff's duties with Defendant were "in furtherance of interstate commerce" as contemplated by 45 U.S.C.A. § 51.

16. Plaintiff's duties with Defendant "directly and substantially affected" interstate commerce as contemplated by 45 U.S.C.A. § 51.

17. Defendant SEPTA is subject to OSHA rules and regulations, as well as its own internal safety rules and regulations and practices.

## BACKGROUND

18. Plaintiff and several crew members were tasked with using a Demo saw to cut large slabs of corrugated galvanized steel pan decking into portions, to be then laid and later filled with concrete.

19. Plaintiff, his supervisor, and crew members arrived on site and found that the galvanized steel decking was surrounded by potentially hazardous, bulky, and flammable materials.

20. Plaintiff and his crew members were immediately concerned, as the Demo saw operates with blades that throw off tiny pieces of hot, galvanized steel, which can travel upwards of thirty (30) feet – even without wind affecting them.

21. The near-liquefied steel sparks and dust generated by the Demo saw are an extreme fire hazard, in addition to being dangerous and potentially injurious if coming in contact with human tissue.

22. No Lull (specialized skidsteer) was on site, and none elsewhere was made available to Plaintiff or crew members, to move the hazards or relocate the galvanized steel decking, in violation of regulations.

23. Moreover, no proper windscreens were available on site, and none elsewhere were made available to Plaintiff or the crew, and there was no feasible way to fashion a makeshift windscreen using the materials on hand.

24. Plaintiff and his crew were directed by his supervisor to proceed. The supervisor denied requests to delay to wait for equipment to relocate the materials or to obtain a windscreen.

25. Plaintiff warned his supervisor that the site was unsafe, and that cutting the decking was not an urgent priority necessitating the obvious increased risks of performing the task without the necessary safety protocols and clearances in place.

26. Despite the warnings and unsafe conditions, Plaintiff and crew were instructed by supervisor to maneouver over the materials to take the necessary measurements and ultimately perform the task.

27. Plaintiff and his crew donned the appropriate safety protective gear and proceeded to engage in the task.

28. After Plaintiff began working, the supervisor left the site for some time.

29. Plaintiff was operating the Demo saw when he noticed his supervisor return, and that the supervisor was gesturing and yelling something toward Plaintiff in an animated fashion.

30. Plaintiff handed the Demo saw to a crew member, who continued operating the saw, while Plaintiff stepped away to speak with the supervisor.

31. Plaintiff raised his protective hood, but still had his protective glasses on, to speak with the supervisor, but as he did, several hot steel shards and particles was blown into his eye.

32. Plaintiff was immediately subjected to intense pain and discomfort and felt foreign fragments in his eye.

33. Plaintiff and supervisor immediately attempted to flush the eye with on site eyewash, and while he was still in pain and unsure about the eye and its loss of vision, he believed the fragments had been washed free.

34. The next day it was apparent to Plaintiff from the swelling and severe eye pain and some loss of vision, that some fragments must remain in the eye. Plaintiff reported the injury and Defendant SEPTA directed him to Temple University Hospital Emergency Room.

35. Defendant SEPTA has a longstanding contract for eye injuries with Wills Eye

Center, one of the top eye specialist/surgery centers in the country, due to the relative-frequency of eye injuries among workers.

36. Despite the availability of the experienced surgeons at Wills Eye Center, Defendant SEPTA ignored or refused to send Plaintiff to Wills Eye Center, and instead sent him to Temple Emergency Center.

37. The physicians at the ER advised Plaintiff that they removed all fragments from the eye.

38. On November 13, 2023, Plaintiff was still suffering from loss of sight and severe pain and discomfort, and reported it to Defendant.

39. Despite the contract with Wills Eye Center, Defendant again directed Plaintiff to an ER, this time of Jefferson Hospital, Washington Township.

40. The Physicians at Jefferson took Xray/CT images of the eye, and performed a procedure.

41. Plaintiff was thereafter informed that they removed all remaining fragments of steel from his eye.

42. Plaintiff's severe pain and discomfort did not subside and his vision did not return, so on November 22, 2023, Plaintiff was referred to Dr. Gorman, an eye specialist.

43. Dr. Gorman examined Plaintiff and determined that there was still fragments of steel in the eye; however, due to the delay in treatment by a specialist like the ones at Wills or himself, the eye had healed over the remaining fragments and were now deeply embedded.

44. Dr. Gorman informed Plaintiff that the only solution was to drill out the remaining steel fragments, and opined that Plaintiff should expect a partial permanent loss of vision.

45. Dr. Gorman also opined that, had Defendant sent Plaintiff to a specialist like himself <u>originally</u>, all fragments could have been successfully removed, the eye would not have healed over and embedded steel fragments, and no permanent injury would have resulted.

46. Plaintiff reported Dr. Gorman's opinion to an assistant director of Defendant, who expressed "shock" that Plaintiff was not transported directly to Wills Eye on the date of the incident as SEPTA policy dictated.

47. The same assistant director of Defendant informed Plaintiff that he personally had previously had metal fragments in his eye while working, and was transported directly to the specialists at Wills, and he had no permanent injuries.

48. As a result of this injury, Plaintiff has sustained a permanent loss of vision and reduction in function, and a "dead spot" in the direct center lens of his eye. This dead spot causes a halo and starlight effect interfering with his ability to drive, particularly at night.

49. Plaintiff now requires a special corrective lens and it is estimated he has lost more than 10% of the center of the field of sight of his eye.

50. Plaintiff's permanent loss of vision also affects his ability to perform his job, in that he has more difficulty with certain lighting conditions and the welding arc itself

causing a halo effect.

51. Plaintiff's injuries are permanent, painful, and frustrating, and directly affect his quality of life. The injuries have permanently impaired his ability to enjoy life and to perform at work.

52. Plaintiff's injuries have required both past and future medical treatment, and Plaintiff has been forced to pay out of pocket for some medical expenses.

53. Plaintiff has or may have suffered other damages as a result of the injuries described above. In this lawsuit, he claims compensation for all injuries and damages recoverable under FELA, including medical bills, pain and suffering, mental distress, lost wages and earning capacity, and disfigurement, whether or not specifically alleged.

54. Defendant caused Plaintiff's injuries by violating FELA and related laws and regulations enacted for the safety of railroad workers. Because of its statutory negligence and violation of the law and regulations related to FELA, Defendant is legally obligated to compensate Plaintiff for his injuries.

55. Defendant SEPTA was negligent in the following ways:

    a. failing to provide a safe workspace by failing to account for the site conditions;

    b. failing to advise supervisors/foremen of the Wills contract and directive to take injured workers to Wills eye specialists;

    c. ignoring the specific warning of the Plaintiff and co-workers to his

8

    supervisor prior to the incident as to the impact of 15-20MPH wind gusts;

d. failing to have a lull (forklift) available to clear hazardous materials or otherwise relocate the steel pan decking to a safe location;

e. failing to provide a safe workspace by providing windscreens to shield workers from the hot steel fragments, or allowing Plaintiff to erect same;

f. failing to clear hazardous and combustible materials from the operating and cutting area;

g. directing Plaintiff and co-workers to proceed with using a Demo saw to cut corrugated steel pan decking without a safe clearance established around the cutting area, in violation of regulations;

h. Failing to warn him of known or reasonably foreseeable dangers;

i. failing to provide with adequate equipment;

j. failing to provide with adequate assistance;

k. failing to adhere to safety guidelines and regulations;

l. failing to enforce proper rules, procedures, and common sense safety precautions;

m. failing, on two separate occasions, to refer Plaintiff to Wills Eye Center for immediate treatment of his injuries, as protocol dictates;

n. improperly assigning duties likely to result in injuries he suffered;

o. failure to inspect work areas; and,

p. was otherwise negligent through its officers, agents, and employees which

will be developed more fully during the course of discovery but not necessarily specifically alleged herein.

56. A Jury trial is demanded.

WHEREFORE, Plaintiff demands judgment against Defendant in excess of $75,000.00, plus costs and interest and expenses of suit.

_____
**TREVOR C. SERINE, ESQUIRE**
PA ID No.: 316805
Serine Law
30 West Third Street, First Floor
Media, PA 19063
P: 484.448.6426